Estate of William R. Buckminster, Deceased, Constance B. Hauser, Executrix v. Commissioner.
Estate of Buckminster v. Commissioner
Docket No. 111634.
United States Tax Court
1944 Tax Ct. Memo LEXIS 351; 3 T.C.M. (CCH) 192; T.C.M. (RIA) 44071; February 28, 1944
*351 Hugh C. Bickford, Esq., David L. Milne, C.P.A., and Randolph Fuller, C.P.A., for the petitioner. James C. Maddox, Esq., for the respondent. SMITH Memorandum Findings of Fact and Opinion SMITH, Judge: This is a proceeding for the redetermination of a deficiency in estate tax in the amount of $37,111.75. The question in issue is whether there should be included in the net estate of the decedent transfers of securities by the decedent to his daughter, and of his summer and winter homes to his wife (all of his property) on or about December 26, 1934. The respondent contends that the transfers were made (1) either in contemplation of death, or (2) intended to take effect in possession or enjoyment at or after death. Findings of Fact The petitioner is the executrix of the Estate of William R. Buckminster, who died on October 14, 1939, a resident of Tamworth, New Hampshire. An estate tax return was filed for the estate with the collector of internal revenue for the district of New Hampshire. William R. Buckminster was born on January 17, 1872. He was graduated from the Harvard Law School in 1894 or 1896 and soon thereafter began the practice of law in Boston, Mass. He was married in *352 1896 or 1897 to Mary A.E.M. Buckminster. Two daughters were born of the marriage, Constance, the petitioner herein, and Joan, who died in Egypt in 1928. The decedent inherited a large amount of securities from his father and was given the income or a portion of the income of a trust created by his father with the Boston Safe Deposit & Trust Co. as trustee. From this trust he received an income of approximately $12,000 a year during the period 1933 to 1939. Upon his death the income from this trust fund was to become payable to his daughter. The value of the securities left him by his father was in 1933 between $300,000 and $400,000. The decedent was not dependent upon income from his law practice and during the later years of his life was not actually engaged in practice. During the years prior to 1933 he traveled extensively. The decedent was fond of outdoor life. In 1922 he purchased a summer home consisting of about nine acres of land in the town of Tamworth, N.H. This summer home is near the base of Mt. Chocorua and the post office at which he received his mail is Chocorua. The decedent enlisted in the army and served during the World War. He attained the rank of captain. He *353 was slightly gassed during his service. Prior to 1933 the decedent suffered some from dizziness. He was under observation in the Massachusetts General Hospital several days in May, 1930. It was found that his thyroid was 20 percent deficient but the physicians could not get blood to make a blood test because his veins were small and collapsed on puncture. In 1931 he spent three or four days in a hospital as a result of which he was advised to smoke less and take more exercise. On March 12, 1933, he had a dizzy spell and was taken to the New England Deaconess Hospital in Boston. He did not lose consciousness. It was found that he had had a shock or cerebral hemorrhage. He had double vision. His blood pressure was high. He was taken from the hospital to his home in Boston in an ambulance in an unimproved condition on March 23, 1933. He was attended by a day and a night nurse for some weeks while confined to his bed at home. He later recovered sufficiently to be driven in an automobile through the arboretum and parks but was not permitted to get out of the car. Still later he was able to walk with some assistance. Decedent's physician, Dr. Harry W. Goodall, told his daughter, Constance *354 that her father was a sick man and that it was uncertain whether he would recover. He did, however, recover sufficiently to go to his summer home in Tamworth, N.H., in the latter part of May, 1933, where he stayed until the fall when he returned to his winter home in Boston. While at his summer home he regained some of his strength, took short walks, and bathed in the lake. After returning to Boston in the fall of 1933 he attended to some business matters and closed up his law practice. From the time of his stroke on March 12, 1933, to the date of his death, the decedent was either in the care of a nurse or a companion. In October or November, 1933, Charles K. Scotcher was engaged as a companion for the decedent. It was his duty to see that the decedent did not overexercise or get overfatigued and to see that he took medicine regularly to reduce his blood pressure. In the spring or early summer of 1934 the decedent again went to his summer home at Tamworth, N.H., where he resided permanently from then until the date of his death. In July 1934 Dr. Edwin C. Remick, of Tamworth, made an examination of the decedent. He found that he had had a shock, that he had high blood pressure and *355 was suffering from myocarditis; also that the left side of his face was slightly drawn around to the side. His mind was clear and his powers of locomotion were normal. The decedent's wife made an arrangement with Dr. Remick to see her husband periodically and he did so about once a week from then on to the end of his life except when he was absent on a visit to Boston or elsewhere. The doctor realized that his patient was a sick man. He became very much worse later in life and had several slight cerebral hemorrhages or embolisms. During the years 1934, 1935, 1936, and 1937 the decedent was able to take short hikes in the woods and bathe in the lake. On May 12, 1933, the decedent executed a power of attorney to his daughter, Constance, and her then husband, William L. Marcy, Jr., a practicing attorney of Buffalo, N. Y., giving them full and complete power to act for him in all business matters. Prior to that time his wife had been given authority to sign checks on his bank account. On May 24, 1933, the decedent executed a revocable trust naming the Boston Safe Deposit & Trust Co. and his daughter, Constance, as trustees, placing all of his securities in trust, the income to be paid *356 to him during his life and upon his death to deliver the trust property to his estate, retaining the right in himself and his daughter to withdraw part of the principal of the trust at any time. This arrangement of having two trustees did not work out satisfactorily. The daughter had investment counsel to make a survey of the securities held in the revocable trust soon after she was made a joint trustee. The investment counsel recommended certain changes in investments and these recommended changes appealed to Constance and her husband. Constance found, however, that the Boston Safe Deposit & Trust Co. did not act quickly upon the suggestions made with the result that often the market was less favorable at the time they approved a suggested change than it was at the time the recommendation was made. The arrangement becoming unsatisfactory, the decedent, on July 27, 1933, revoked the trust and in September received from the Boston Safe Deposit & Trust Co., where the securities were deposited, all the securities so held in trust. At the time of the revocation of the above trust all those things which were required to be done with respect to decedent's securities were handled by decedent's *357 daughter and her husband under the power of attorney of May 12, 1933. On December 26, 1934, the decedent deeded his Boston home and his summer home at Tamworth, N.H., to his wife. On the same day he transferred to his daughter all of his securities with the provision that she should pay all of the income therefrom to his wife during her life and until the decedent's death, and upon his death the daughter was to retain one-third of the income and pay over the remaining two-thirds to the decedent's wife. The daughter was eventually to receive the corpus of the trust. The arrangement that two-thirds of the income from the securities should be paid to his wife at decedent's death was for the purpose of equalizing the income of the daughter and her mother after the date of the decedent's death; for upon his death the daughter was to receive the income from the trust estate created by decedent's father, the grandfather of Constance. Decedent filed original and amended gift tax returns covering properties transferred on December 26, 1934. Gift taxes were paid thereon amounting to $26,094.92. The respondent upon audit of this return asserted a deficiency of $119.81, which was duly paid, *358 making the total gift taxes paid $26,214.72. The respondent has given the petitioner credit for the payment of this amount of gift tax in the determination of the deficiency herein. After December 26, 1934, the decedent lost interest in the investments made by his daughter. When she visited him she and her father never discussed investment matters. The decedent's condition was such that he also lost interest in politics and public affairs. By the transfers of property made by the decedent on December 26, 1934, the decedent disposed of all of his property. Thereafter his income consisted only of interest and dividends paid over to him by the trustee of his father's trust. This was sufficient to pay decedent's expenses and leave a small balance besides. In order to dispose of any remaining property which decedent might own at the date of his death, the decedent, on November 17, 1937, executed his last will and testament giving all to his daughter, Constance. After decedent's return from the World War he had given Christmas and birthday presents to Constance of small amounts of stock, aggregating in all by 1933 between $5,000 and $10,000 in value. Decedent also gave his daughter an *359 allowance to provide her with pocket money, which, after her marriage, amounted to $200 a month. Decedent's daughter inherited money from her grandparents' estate. In 1934 her income-producing property had a value of at least $30,000. The decedent's condition was much worse in 1938 and 1939 than in former years. He suffered several slight shocks and was confined to his bed under the care of a nurse. He died at Tamworth, N.H., on October 14, 1939. The death certificate shows that the principal cause of death was a cerebral emoblism of five years and three days duration, chronic myocarditis of four years duration, and chronic nephritis of four years duration. The transfers of property made by decedent on or about December 26, 1934, were made in contemplation of death. Opinion The questions presented are whether the transfers of all of decedent's property made on December 26, 1934, were made (1) either in contemplation of death, or (2) intended to take effect in possession or enjoyment at or after death. Section 811, Internal Revenue Code, provides for the inclusion in the gross estate of a decedent of: (c) Transfers in Contemplation of, or Taking Effect at Death. - To the extent *360 of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, * * * Whether a gift is made in contemplation of death has been considered by the Supreme Court in United States v. Wells, 283 U.S. 102. With respect to this phrase the Supreme Court has said at page 115: * * * It is recognized that the reference is not to the general expectation of death which all entertain. It must be a particular concern, giving rise to a definite motive. The provision is not confined to gifts causa mortis, which are made in anticipation of impending death, are revocable, and are defeated if the donor survives the apprehended peril. * * * The statutory description embraces gifts inter vivos, despite the fact that they are fully executed, are irrevocable and indefeasible. The quality which brings the transfer within the statute is indicated by the context and manifest purpose. Transfers in contemplation of death are included within the same category, for the purpose of taxation, with transfers intended to take effect at or after *361 the death of the transferor. The dominant purpose is to reach substitutes for testamentary dispositions and thus to prevent the evasion of the estate tax. * * * As the transfer may otherwise have all the indicia of a valid gift inter vivos, the differentiating factor must be found in the transferor's motive. Death must be "contemplated," that is, the motive which induces the transfer must be of the sort which leads to testamentary disposition. As a condition of body and mind that naturally gives rise to the feeling that death is near, that the donor is about to reach the moment of inevitable surrender of ownership, is most likely to prompt such a disposition to those who are deemed to be the proper objects of his bonty, the evidence of the existence or non-existence of such a condition at the time of the gift is obviously of great importance in determining whether it is made in contemplation of death. * * * In Igleheart v. Commissioner (C.C.A., 5th Cir.) 77 Fed. (2d) 704, 709, the court said: "A gift is to be regarded as made in contemplation of death where the dominant motive of the donor is to make proper provision for the donee after the death *362 of the donor." The Supreme Court has recognized that gifts of a material part of a person's estate made even within two years of the date of death may arise from motives which are connected with life. It is only where the predominant motive is contemplation of death that such donated property is to be included in the gross estate, whether made within two years of the date of death or not. In Updike v. Commissioner (C.C.A., 8th Cir.), 88 Fed. (2d) 807, reference was made to the case of United States v. Wells, supra, and to many decisions of the courts applying the doctrine of that case. The court said: * * * So far as applicable here, these decisions establish the following propositions: (1) The test of whether or not the transfer was made in contemplation of death is always to be found in the transferor's motive; (2) "the motive which induces the transfer must be of the sort which leads to testamentary disposition"; (3) in determining the presence or absence of such motive the fact-finding tribunal, where the evidence is circumstantial, should take into consideration such circumstances as (a) the condition of the body *363 and mind of the transferor, (b) his age, (c) his desire to be relieved of responsibility, (d) his desire to discharge any moral obligations, or (e) his purpose to carry out some previously adopted policy with respect to the objects of his bounty. But, it is pointed out by the Supreme Court in the Wells case, supra, that "It is apparent that there can be no precise delimitation of the transaction embraced within the conception of transfers in 'contemplation of death,' as there can be none in relation to fraud, undue influence, due process of law, or other familiar legal concepts which are applicable to many varying circumstances. There is no escape from the necessity of carefully scrutinizing the circumstances of each case to detect the dominant motive of the donor in the light of his bodily and mental condition, and thus to give effect to the manifest purpose of the statute." It is the petitioner's argument here that the decedent was a man who was fond of nature, enjoyed hiking, mountain-climbing, and camping; that for a number of years prior to 1933 he had looked forward to the time when he could retire to the country and enjoy himself in such pursuits; that the transfers *364 made on December 26, 1934, of all of his property were made in order to be relieved of the cares of business and to enable him to carry out a long cherished plan. Although this may have been one of the reasons for the transfers we are of the opinion that it was not the dominant motive. The evidence shows conclusively that the decedent was a sick man from the time he was stricken with the cerebral hemorrhage on March 12, 1933. He never recovered his former health. The result of the shock was visible in a paralysis of the face. Furthermore, it often showed in a weakness of his legs. It is true that he regained a portion of his strength but the evidence indicates that he was always an invalid. He enjoyed automobiling and did much of it from 1933 to the end of his life. But he had to be careful not to overexercise. He took short hikes in the woods and the decedent's widow contends that he climbed Mt. Chocorua with his niece after his cerebral hemorrhage in 1933. But his diary shows that this was in 1932, or the year preceding the date that he was first stricken. During much of the time that he was at his summer home in New Hampshire he was an invalid. He usually had breakfast in bed *365 and arose and dressed around ten o'clock. He might then take an automobile ride and sometimes go bathing in the lake nearby. But his constant attendant saw to it that he did not overexercise. Although he was an educated man his eyesight prevented him from reading very much. His companion read to him and conducted much of his correspondence. On December 26, 1934, the decedent gave away all of his property to persons entitled to his bounty. He deeded to his wife his home in Boston and his summer home at Tamworth, N.H. He gave all of his securities to his daughter but charged her with the payment of the income therefrom to his wife so long as he should live. The deed of gift for the securities was drafted by his son-in-law, an attorney of Buffalo, N. Y., the husband of Constance. The decedent requested him to come to Boston where he was then located for the purpose of discussing the drafting of the instrument. Marcy testified in part as follows: My further recollection is that the provision which provides that upon the death of the donor, Mr. William R. Buckminster, his wife shall receive 2/3 of the net income of the property being given by gift and a further provision that upon his *366 death the donee would retain 1/3 of the income about equally balances the total income from both trusts; in other words, that the former Mrs. Marcy [at the date of the deposition she was Constance B. Hauser] and her mother, Mrs. William R. Buckminster, would upon the death of the Captain [William R. Buckminster] receive approximately 1/2 of the total income each, which would be payable to his heirs upon his death. The deposition further reads: Q. Did Captain Buckminster state to you his purpose in making the gift? A. Yes, the Captain had retired from business some time prior to this, although he had never been actively engaged in the practice of law, but my recollection is that he had closed his office and was living the major part of the time at his summer home at Chocorua. He stated, to the best of my recollection, that he desired that his daughter should have the experience of handling the securities during the remainder of his life; that he wanted her to benefit from his advice; that he wanted to be relieved of the responsibility; and that he wanted to spend more and more time at his summer home. There can be no question that at the time the transfers were made the decedent *367 was a sick man. He was suffering from high blood pressure. He had had a cerebral hemorrhage. The effects of the shock showed in his face. On December 26, 1934, the decedent gave away all of his property to those entitled to his bounty. We can not lightly assume that a sick man who has had a cerebral hemorrhage, and who is suffering from high blood pressure and myocarditis, gives away all of his property without being motivated by a contemplation of death. Cf. Updike v. Commissioner, supra. That the decedent was motivated by the thought of death seems to us to be clear from the deposition of the decedent's son-in-law, Marcy, that the arrangement was made so that his daughter and his widow would each have the same amount of income after his death. It is further to be noted that there is nothing in the evidence which would indicate that the decedent's daughter was in 1934 in need of a larger income than she was receiving. Her husband was a practicing attorney in Buffalo, N. Y. She was receiving the income from her own securities and there is nothing to indicate that the decedent intended to give her a larger income by reason of the transfer. Indeed, *368 she was not to receive any income from the donated securities prior to decedent's death. Until then all of the income was to be paid to her mother. We are of the opinion that all of the evidence in this case points to the fact that the dominant motive for the transfers made by the decedent on December 26, 1934, was "contemplation of death" as that phrase is defined by the Supreme Court in United States v. Wells, supra. The transfers were plainly substitutes for testamentary disposition. Since we have reached this conclusion it is unnecessary to consider the respondent's alternative contention that the transfers were made to take effect in possession or enjoyment at or after the death of the decedent. Decision will be entered for the respondent